OPINION OF THE COURT
James H. Ferreira, J.
This action concerns the birth of Milo L. Proctor (hereinafter the infant) on March 28, 2011. Plaintiff, the infant’s mother, commenced this action, individually and as administratrix of the infant’s estate, seeking damages arising from allegedly negligent medical care and treatment rendered by defendants to the infant before, during and after his birth and to plaintiff during her pregnancy, labor and delivery. The complaint alleges a wrongful death claim on behalf of the infant and also seeks damages for plaintiff’s own emotional distress arising from the alleged medical malpractice.
Presently pending before the court are the motions of defendants Jane Swingle, CNM (motion No. 1), and The Mary Imogene Bassett Hospital, doing business as Bassett Medical Center (hereinafter Bassett), and Thurston Corporation, doing business as Bassett Healthcare Network (hereinafter collectively referred to as defendants) (motion No. 2) for partial summary judgment dismissing plaintiff’s claim for emotional distress. Plaintiff opposes the motions and defendants have *628 submitted replies.[1] Trial in this matter is scheduled to commence on April 25, 2017. The court heard oral argument on these motions on February 24, 2017.
The viability of plaintiffs claim for emotional distress turns on the applicability of two Court of Appeals decisions. In Broad-nax v Gonzalez, the Court of Appeals held that, in a case where a child is stillborn, a mother may recover damages for emotional distress arising from medical malpractice which resulted in miscarriage or stillbirth even in the absence of an independent injury to the mother (2 NY3d 148, 155 [2004]). By contrast, where a child is injured in útero but born alive, the mother’s cause of action for emotional distress can proceed only to the extent that she seeks damages for emotional harm that she suffered as a result of an injury independent of the birth of an impaired child (see Sheppard-Mobley v King, 4 NY3d 627, 636-637 [2005]). According to the Court of Appeals, the reason for this distinction is that a child born alive may maintain an action for injuries inflicted in útero, whereas no claim for wrongful death exists on behalf of a child who is stillborn (see id. at 637). The holding in Broadnax is “a narrow one, intended to permit a cause of action where otherwise none would be available to redress the wrongdoing that resulted in a miscarriage or stillbirth” (id.). Public Health Law § 4130 (1) defines live birth as
“the complete expulsion or extraction from its mother of a product of conception, irrespective of the duration of pregnancy, which, after such separation, breathes or shows any other evidence of life such as beating of the heart, pulsation of the umbilical cord, or definite movement of voluntary muscles, whether or not the umbilical cord has been cut or the placenta is attached; each product of such a birth is considered live born.”
The motions for partial summary judgment currently pending before the court are the second of such motions filed by these defendants. While discovery was ongoing, most of the defendants in this action moved for partial summary judgment dismissing plaintiff’s claim for emotional distress. Plaintiff opposed the motions and cross-moved for partial summary judgment in her favor as to the viability of her claim for emotional *629 distress. The court denied these motions by decision and order dated October 19, 2015. The court found that the evidence presented in the motions—consisting of medical records and competing physician’s affidavits—revealed the existence of an issue of fact with respect to whether the infant was born alive within the meaning of Public Health Law § 4130 (1), precluding the granting of summary judgment for either side with respect to plaintiffs claim for emotional distress. Specifically, the court found that it had before it conflicting evidence as to whether the infant had a heartbeat at birth or whether, instead, his heartbeat was the result of resuscitative measures taken by hospital staff after his birth. The court stated that its denial of those motions was without prejudice to reapplication after the completion of discovery.
Discovery is now complete and, as noted above, defendants Jane Swingle, CNM, The Mary Imogene Bassett Hospital, doing business as Bassett Medical Center, and Thurston Corporation, doing business as Bassett Healthcare Network, have renewed their motions for partial summary judgment.
Summary judgment is a drastic remedy which should only be granted where there are no doubts as to the existence of a triable issue of fact (see Rotuba Extruders v Ceppos, 46 NY2d 223, 231 [1978]; Andre v Pomeroy, 35 NY2d 361, 364 [1974]; Black v Kohl’s Dept. Stores, Inc., 80 AD3d 958, 959 [3d Dept 2011]). “[T]he proponent of a summary judgment motion must make a prima facie showing of entitlement to judgment as a matter of law, tendering sufficient evidence to demonstrate the absence of any material issues of fact” (Alvarez v Prospect Hosp., 68 NY2d 320, 324 [1986]; see Smalls v AJI Indus., Inc., 10 NY3d 733, 735 [2008]; Baird v Gormley, 116 AD3d 1121, 1122 [3d Dept 2014]). If the proponent’s burden is met, “the burden shifts to the party opposing the motion for summary judgment to produce evidentiary proof in admissible form sufficient to establish the existence of material issues of fact which require a trial of the action” (Alvarez v Prospect Hosp., 68 NY2d at 324; Town of Kirkwood v Ritter, 80 AD3d 944, 945-946 [3d Dept 2011]). In considering a summary judgment motion, the Court “must view the evidence in a light most favorable to the nonmoving party and accord that party the benefit of every reasonable inference from the record proof, without making any credibility determinations” (Black v Kohl’s Dept. Stores, Inc., 80 AD3d at 959; see Winne v Town of Duanesburg, 86 AD3d 779, 780-781 [3d Dept 2011]).
*630 In support of their motions, defendants have submitted, among other things, certified copies of plaintiff’s and the infant’s medical records and a number of deposition transcripts. The relevant medical evidence can be summarized as follows. On March 26, 2011, plaintiff, who was 41 weeks pregnant, was admitted to defendant Bassett Medical Center for induction of labor. After several hours of labor, the infant was vaginally delivered on March 28, 2011 at 2:41 a.m. Nurse’s notes state that he was floppy, pale and without respiratory effort but had a heart rate of more than 100 beats per minute. According to the notes of the attending physician, staff noted that he had “a nuchal cord x2 loose, terminal meconium and had a heart rate more than 100 beats per minute with no spontaneous respiration, cry or movement” (affirmation in support of motion No. 1, exhibit G, at rush final note). He was given chest compressions in the delivery room by nursing staff and was intubated and attached to a ventilator; the physician’s notes indicate that he “had received [positive pressure ventilation] by 30 seconds of life and was intubated by 5 minutes” (id.). His Apgar score at one minute of life was two (with two points assigned for heart rate), his Apgar score at five minutes of life was four (with two points assigned for heart rate, one point assigned for color and one point assigned for reflex) and his Apgar score at 10 minutes of life was four (same). The attending physician’s notes indicate that, although his oxygen saturation improved and his heart rate stabilized, the infant’s respiratory status eventually began to deteriorate and it became increasingly difficult to maintain aeration and blood pressure levels. Plaintiff and her husband were informed that the infant had potentially suffered hypoxic ischemic injury and was not stable for transport to Albany Medical Center for further care. They opted to withdraw life support treatment, and he was extubated at 7:20 a.m. The infant was noted to have expired at 8:21 a.m. on March 28, 2011. A death certificate was issued which listed the immediate cause of death as intrauterine asphyxia.
In her deposition, plaintiff testified, in relevant part, that, after the infant was delivered, the nurses “immediately [took] him to the corner and started working on him” (affirmation in support of motion No. 1, exhibit I, at 34). When the infant was delivered, he “seemed limp and lifeless and [she] never heard him cry” (id. at 126). She testified that she did not see the infant until “hours after” the delivery (id. at 36). She was aware that specialists at Albany Medical Center had been contacted *631 and that transporting the infant to that hospital had been discussed; plaintiff testified that she was later told that “it would take too long” and “it was too late” {id. at 37). She testified that it was her understanding that the infant “was only-living because of his life support” {id. at 143). Plaintiff stated that the infant was taken off life support and that he died around 8:40 a.m. She held him after he was taken off life support; he was “very pale” and breathed for about 10 to 15 minutes {id. at 138). She affirmed that the infant was not attached to any machines or monitors and did not have any tubes in his body during this time.
Plaintiff’s husband, Eric Proctor, testified, in relevant part, that the infant was “gray and lifeless” when he was born and the nurses immediately took him to the corner; he testified that the nurses were blocking his view of the infant and that he did not know what they were doing (affirmation in support of motion No. 1, exhibit J, at 14). Mr. Proctor confirmed that the doctors had discussed transporting the infant to Albany Medical Center but later determined that the “time frame was misconstrued . . . and they didn’t think he would make it to Albany Med” {id. at 20). He testified that, at some point, the infant was given to plaintiff to hold without any tubes and without any life support. While she was holding him, the infant took “short . . . painful breaths every couple of minutes” {id. at 23). When asked how he knew the infant had died, Mr. Proctor stated that he “was holding him when he wasn’t breathing anymore” {id. at 23-24).
Rene Ferreira, RN, testified that she was employed as a labor and delivery nurse at Bassett at the time of the infant’s delivery and that she was the nurse who primarily attended to plaintiff. She testified that she had reviewed the medical records in anticipation of her deposition and that the records had refreshed her memory with respect to plaintiff’s labor and the delivery of the infant. She affirmed that, prior to reviewing these records, she did not have any independent recollection of the delivery. She testified that the resuscitative efforts were made on the baby warmer, which is “[a]bout three feet from the foot of the patient’s bed” and that the infant would have been delivered and then brought over to the warmer (affirmation in support of motion No. 1, exhibit K, at 82). She affirmed that her notes indicated that, at the time of birth, the infant was floppy with no respiratory effort and that his heart rate was over 100. Ferreira testified that the heart rate was *632 determined either by stethoscope or by palpating the umbilical cord; she was not sure which method was used. She testified that the heart rate would have been assessed “[wjithin the first few seconds”; when asked how she knew that, she testified “[bjecause that’s what we do” (id. at 87). She stated that, according to her notes, the heart rate was obtained after the infant was brought to the warmer and affirmed that her notes conveyed the sequence of events to the best of her knowledge. Nurse Ferreira testified that she had an independent recollection of resuscitating the infant at the warmer. She confirmed that an Apgar score of two at one minute of life would mean that the infant’s heart rate was over 100. She also confirmed that representatives from Albany Medical Center had come to Bassett to transfer the infant to Albany and that there would not be any reason to transfer a stillborn baby to Albany Medical Center. She testified that “[i]t would be safe to say the baby was not stillborn” (id. at 98).
Nicole Bruno, DO, testified that she was the on-call attending pediatrician at the time of the infant’s birth. She arrived at the hospital around 3:15 a.m. She was told that the infant had been intubated, after several attempts, and that chest compressions had been performed “due to a heart rate that was dropping” (affirmation in support of motion No. 1, exhibit L, at 18). Multiple intubation attempts had been required because the treatment providers “were concerned that they were not having proper placement because they were not getting adequate response from the baby” in terms of “[g]ood chest movement, air movement” (id. at 24). She examined the infant upon arrival; he had a weak pulse and an adequate heart rate and she heard “[c]oarse breath sounds” (id. at 20). She affirmed that, although he was not breathing on his own, he was able to maintain his blood pressure without assistance. She testified that, after the infant was removed from the ventilator and ex-tubated, he “remained alive for approximately 20 minutes after being removed” (id. at 75).
In her deposition, Nicole Finger testified that she is a registered staff nurse employed by Bassett. She testified that she has an independent recollection of the infant’s birth. She stated that she entered the room after the infant had been delivered and was on the warmer. She testified that the warmer is about five feet away from the patient’s bed. Nurse Finger observed nurse Ferreira trying to stimulate the infant; nurse Ferreira told her that the infant had just been born and that *633 he had a heart rate of over 100. At that point, no assistive ventilation was occurring. Nurse Finger immediately started positive pressure ventilation; she observed that the infant was white and had floppy muscle tone. She affirmed that he made no respiratory effort on his own. Shortly thereafter, another nurse took over the positive pressure ventilation and attempted to intubate the infant. Nurse Finger did not recall chest compressions being performed.
Defendants have also submitted the affidavit of Patricia R. Chess, M.D., a physician board-certified in pediatrics and neonatal-perinatal medicine. In her affidavit, Dr. Chess states that she has reviewed, among other things, the medical records and deposition testimony and opines, to a reasonable degree of medical certainty, that the infant “was born alive on March 28, 2011 at 2:41 a.m. and survived approximately six hours until he expired on March 28, 2011 at about 8:41 a.m. following withdrawal of life sustaining treatment” (affirmation in support of motion No. 1, exhibit H, ¶ 5). She notes that a certificate of live birth was issued for the infant and asserts that a certificate of live birth would not have been issued if he were stillborn. She further notes that “[l]ogic dictates” that he would not have been given positive Apgar scores if he had been stillborn, and that the Apgar score of two for heart rate indicates that he was born alive {id. f 8). Dr. Chess also states that the fact that the infant had spontaneous respirations for about 20 minutes after the ventilator and endotracheal tube were removed means that the infant was not “brain dead” prior to his actual cardiac death at 8:41 a.m., and that “[t]he presence of spontaneous respirations negates any finding of brain death” {id. ¶ 11). She also avers that “Compressions in neonatal resuscitation are done if the infant’s heart rate is less than 60 beats per minute. The fact that compressions may have been done does not mean that the infant had no pulse” {id. f 13). Dr. Chess also notes that the infant’s first pulse of over 100 was obtained when the infant was placed on the warmer prior to any resuscitative measures being taken.
Upon due consideration, the court concludes that the foregoing evidence is sufficient to establish defendants’ entitlement to judgment as a matter of law dismissing plaintiff’s claims for emotional distress arising from the birth of an impaired child. Specifically, the evidence establishes that the infant was born alive within the meaning of Public Health Law § 4130 (1), such that plaintiff’s causes of action for emotional distress arising *634 from the birth of an impaired child cannot proceed (see Sheppard-Mobley v King, 4 NY3d at 636-637). The deposition testimony of nurse Ferreira and nurse Finger establishes that the infant’s heart rate was assessed at over 100 within seconds of his birth and prior to the commencement of resucitative efforts. It is clear from the testimony that his heart was beating on its own and without assistance at the time of his birth. The court disagrees with plaintiff that this deposition testimony adds nothing new for the court to consider with respect to defendants’ motions; to the contrary, the deposition testimony reveals the sequence of events that occurred immediately following the delivery of the infant and establishes that the heartbeat was confirmed by nurse Ferreira prior to any resuscitative efforts being undertaken.[2] In the court’s view, this new evidence is sufficient to establish that the infant had a heartbeat at the time of his birth, and was therefore born alive within the meaning of Public Health Law § 4130 (1).
In addition, the court finds that the other evidence submitted by defendants supports a finding that the infant was born alive, including that: (1) resuscitative measures were taken with respect to the infant following his birth which would not have been taken had he been a stillborn, including the contemplation of transfer to another hospital; (2) the infant was issued both a birth certificate and a death certificate; (3) the infant was not pronounced dead until approximately six hours after his birth; and (4) the infant took breaths on his own for a period of time after being removed from the ventilator and other life support. As such, the court finds that defendants have established that this case falls within the holding of Sheppard-Mobley v King and not Broadnax v Gonzalez, thus entitling them to partial summary judgment dismissing plaintiff’s claims of emotional distress arising from the birth of an impaired child (see Levin v New York City Health & Hosps. Corp. [Harlem Hosp. Ctr.], 119 AD3d 480, 483 [1st Dept 2014], lv denied and dismissed 25 NY3d 962 [2015]; Ward v Safajou, 2014 NY Slip Op 33079[U] [Sup Ct, Putnam County 2014], aff'd 145 AD3d 836 [2d Dept 2016]; compare Mendez v Bhattacharya, 15 Misc 3d 974, 983 [Sup Ct, Bronx County 2007]). *635 As such, the burden shifts to plaintiff to demonstrate the existence of a triable issue of fact.
In opposition, plaintiff has submitted, among other things, various medical records, portions of nurse Ferreira’s deposition and the affidavit of Robert L. McDowell, Jr., M.D., a physician board-certified in pediatrics and neonatal-perinatal medicine. Therein, Dr. McDowell states that he has reviewed the medical records in this case, as well as the depositions and the affidavit of defendants’ expert. He states that the additional evidence that he has reviewed does not alter his opinions—provided to the court in opposition to defendants’ original motions—that, to a reasonable degree of medical certainty, the infant “was not born alive but was a stillborn infant” and was a stillborn infant “regardless of the presence of a heartbeat” (McDowell aff ¶ 9). Dr. McDowell notes that the death certificate indicates that the infant died as a result of intrauterine asphyxia, meaning that the injury which caused his death occurred while the infant was in the uterus; Dr. McDowell opines that “death also occurred while the baby still was in the uterus” (id. ¶ 13).
Dr. McDowell explains:
“The accepted medical definition of life is brain function. Likewise, the accepted medical definition of death is brain death. Medically, death of a fetus occurs when there is cessation of brain wave activity, and when higher brain function ceases. A heart rate alone does not mean that an infant is born alive from a medical standpoint. Rather, an infant is born alive if he shows evidence of brain function. Heart rate is not how doctors determine life or viability since the intrinsic rhythm of the heart does not depend on brain function. In fact, heart rates can be generated for babies with anencephaly, a condition in which a baby is born without parts of the brain. Further, a stillborn baby’s heart can be made to beat with stimulation or resuscitation efforts. Heartbeats, moreover, can develop spontaneously. Here the heartbeat could have been absent at birth and could have begun after the body was placed on the warming table and stimulated while he was being dried or as a result of the aggressive resuscitation efforts that were initiated within 30 seconds following delivery” (id. ¶¶ 42-44).
He opines that cessation of brain activity occurred prior to birth and therefore the infant was stillborn; he notes that the *636 infant did not breathe on his own, never exhibited any neurological response, never cried and never moved {id. ¶ 51). He avers that the record does not support Dr. Chess’ statement that the heartbeat was found prior to resuscitative measures being taken and that “there is no evidence in the medical records that the baby was born with a heartbeat” {id. f 66). He lists a number of ways that a heartbeat can be determined at the actual time of delivery—including using a stethoscope on the infant’s chest or palpating the umbilical cord—and avers that “[n]one of those methods was used here” and that “[n]o heart rate was recorded until at least one full minute after delivery and after resuscitative measures were started” {id. f 46). Dr. McDowell opines that “any heartrate or breathing that did occur after one minute [was] solely the result of the resuscitative efforts, not evidence of life” {id.). He opines that chest compressions would not have been performed if the baby had a heart rate of more than 100 beats per minute and opines that “[t]he fact that chest compressions were required in the delivery room indicates that extensive resuscitative life support measures were needed to precipitate and maintain a heartbeat” {id. ¶ 18). He asserts that “a heartbeat alone does not constitute life, medically” and that the infant “was stillborn by any reasonable medical standard” {id. ¶¶ 67, 69).
Upon careful review, the court finds Dr. McDowell’s affidavit—and the other evidence submitted by plaintiff in opposition—insufficient to defeat defendants’ motions. Plaintiff has not submitted any evidence disputing the evidence submitted by defendants that the infant was found to have a heartbeat of over 100 within seconds of his birth and prior to the commencement of resucitative efforts. In his affidavit, Dr. McDowell focuses on the lack of documentation in the medical records as to when the heart rate was first assessed and ignores the testimony of the nurses as to when the infant’s heart rate of over 100 was first detected. The record simply does not support Dr. McDowell’s opinion that any heart rate was “solely the result of. . . resuscitative efforts” (McDowell aff ¶ 46). In light of the deposition testimony submitted by defendants—which was not before the court when it determined the prior motions in this case—Dr. McDowell’s opinion on this point is no longer sufficient to raise an issue of fact as to whether the infant had a heartbeat at the time of his birth.
Dr. McDowell also avers that the infant was stillborn under any medical definition notwithstanding whether he was born with a heartbeat. However, he has not cited any specific medi *637 cal authority for his assertion that it is brain function—and not heartbeat or breathing—that is the determinative factor as to whether an infant is medically alive or dead at birth. He has also failed to sufficiently provide a factual basis for his opinion that the infant was brain dead at birth. Specifically, he has failed to explain how an infant who is brain dead can have a spontaneous heartbeat—as defendant’s evidence demonstrates—and can breathe on his own without any assistance, as indisputably occurred here when life support was removed. As noted above, defendants’ expert, Dr. Chess, opined that the fact that the infant had spontaneous respirations for about 20 minutes after the ventilator and endotracheal tube were removed means that the infant was not “brain dead” prior to his actual cardiac death and that “[t]he presence of spontaneous respirations negates any finding of brain death” (affirmation in support of motion No. 1, exhibit H, ¶ 11). Dr. McDowell has failed to address this opinion in his affidavit and, in fact, states several times that the infant never breathed on his own, a statement which is not supported by any evidence. Without more, the court finds Dr. McDowell’s assertion that the infant was stillborn despite the presence of a heartbeat at birth to be conclusory and insufficient to demonstrate the existence of an issue of fact for trial. The court is unpersuaded by plaintiff’s contention that the infant was stillborn under the definition of death as set forth in the regulations of the Department of Heath, 10 NYCRR 400.16 (a), which provides that “[a]n individual who has sustained either: (1) irreversible cessation of circulatory and respiratory functions; or (2) irreversible cessation of all functions of the entire brain, including the brain stem, is dead.” Here, plaintiff has not submitted any evidence establishing that, at the time the infant was born, there had been an “irreversible cessation of all functions of the entire brain, including the brain stem” (10 NYCRR 400.16 [a]). As such, the court finds that plaintiff has failed to demonstrate the existence of a triable issue of fact in opposition to defendants’ motions.
Accordingly, it is hereby ordered that defendants’ motions are granted, and plaintiff’s claims for damages for her emotional distress arising from the birth of an impaired child are hereby dismissed.

. Plaintiff has submitted a letter, dated February 17, 2017, in surreply. As there is no apparent prejudice to defendants, the court has considered the letter inasmuch as it is responsive to defendants’ reply submissions.

. The court is unpersuaded by plaintiff’s contention that nurse Fer-reira’s testimony lacks evidentiary value inasmuch as she testified that she did not have independent recollection of the infant’s birth; importantly, she testified that her review of the medical records had refreshed her recollection with respect to the birth and that she had an independent recollection of the resuscitation efforts made.